5 Cal.App.3d 173 (1970)
84 Cal. Rptr. 914
Estate of EMILY MARY JOHNSON, Deceased.
MARCELITE LOCKHART et al., Petitioners and Appellants,
v.
FOUNDATION FOR THE JUNIOR BLIND et al., Claimants and Appellants,
ORTHOPAEDIC HOSPITAL, Claimant and Respondent,
CHAPLIN E. COLLINS, as Coexecutor, etc., et al., Petitioners and Respondents.
Docket No. 33484.
Court of Appeals of California, Second District, Division Four.
March 10, 1970.
*177 COUNSEL
David A. Workman and Walleck & Shane for Petitioners and Appellants.
Maiden & Rosenbloom, Michael B. Spizer, Collins & Woolway and Gilbert Woolway for Claimants and Appellants.
No appearance for Petitioners and Respondents.
Burris & Lagerlof, H. Melvin Swift, Jr., William D. Symmes, Christiana G. Bryson and Joseph J. Burris for Claimant and Respondent.
OPINION
FILES, P.J.
This case involves several appeals from two orders of the superior court sitting in probate.
The order entered November 2, 1967, approved the first account current of the executors, directed preliminary distribution and allowed partial payment of statutory and extraordinary executors' commissions and attorney fees. The order entered December 27, 1967, determined interests in the estate. Since the principal controversy was that resolved by the latter order, we discuss it first.
The decedent, Emily Mary Johnson, a childless widow, died September 1, 1965, at age 78, leaving a will which had been prepared by an attorney and executed October 19, 1962. (1a) The portion of the will which is the subject of controversy is as follows:
"FOURTH: I hereby give and bequeath all of my personal belongings and effects, including all personal property items intended for personal use *178 or adornment and which are present in my residence at 1609 North Alexandria Avenue, Los Angeles, California, in equal shares to MARCELITE LOCKHART and FRANCES TUCKER, or all to the survivor of them if either should predecease me. If they are both living, they shall jointly take possession from my Executors, receipt for said items and thereafter divide same between themselves as they see fit."
Other portions of the will made the following dispositions:
(a) The sum of $3,000 each to Marcelite Lockhart, Frances Tucker, and six other named legatees.
(b) The decedent's home to the Shriners Hospital.
(c) The residue of the estate in equal shares to Foundation for the Junior Blind, Orthopaedic Hospital and Harvard School.
Brothers and a sister of the testatrix were expressly disinherited except to the extent provided in the general legacies.
Marcelite Lockhart and Frances Tucker (hereinafter called petitioners) filed a petition to determine their interests under article Fourth of the will. A hearing was held at which extrinsic evidence was received. Some of the circumstances developed in the record include the following:
At the time of her death the decedent had moved out of her house and was living in an apartment nearby. Her executors found that the house was so filled with boxes and objects that it was difficult to move about. The variety of things ranged from old newspapers and broken glassware, to currency and stocks and bonds. There were over 7,000 coins and pieces of paper money, some of which were arranged in collections. There was also a stamp collection.
The total estate was appraised at more than $400,000, largely in cash and securities. The house and the adjoining vacant lot were valued at $25,000 each. The coin collection, including some gold coins kept in a bank box, was appraised at $23,586 and the stamp collection at $1,468.70.
Under a separate heading in the inventory, which lumped together personal belongings and effects located at the residence, household goods, paintings, antiques, fine arts, collections other than coins and stamps, and miscellaneous items, the appraiser gave a value of $2,500. The appraisement also lists "Jewelry items, omitted from original Inventory" $1,729.
Some of the decedent's furniture was in her apartment, but there is no description of it.
*179 There was a 1955 automobile, appraised at $25, which the executors sold for $100.
There was evidence that the coins and stamps had been collected by decedent's husband, who had died in 1956, and not by decedent. Decedent had sold a part of the stamp collection, and she had made inquiry as to where she could sell the coin collection.
The 1956 inventory and appraisement of the estate of decedent's husband, which included all community property, valued all personal effects, furniture and fixtures at a lump sum of $250. There was no separate listing of the coin and stamp collections in that estate.
The evidence showed that petitioners were long-time close friends of the decedent. She saw them frequently, and occasionally gave them small gifts.
Following the hearing, the court made findings of fact and an order, entered December 27, 1967, which gave petitioners
"(1) All items of personal property of value located in the residence of decedent at 1609 North Alexandria Avenue, Los Angeles, California at the time of her death with the exception of, and excluding, (a) cash; (b) stocks and bonds; (c) promissory notes and deeds of trust; (d) bank books and savings account books; and (e) all coins located in decedent's said residence at the time of her death in coin albums, collectors' coin envelopes, safes, locked closets, locked metal cabinets, and under conditions clearly reflecting that they were acquired as part of a coin collector's coin collection; and
(2) the sum of $100.00 [in lieu of the 1955 automobile which the executors had sold]; ..."
Petitioners have appealed from the portion of this order which limited the personal property bequeathed to them. Foundation for the Junior Blind and Harvard School have appealed from the portion of the order which gives petitioners anything more than the clothing and jewelry of the decedent.
We first refer to some general principles by which a will must be interpreted.
(2) "`The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.'" (Estate of Russell (1968) 69 Cal.2d 200, 205 [70 Cal. Rptr. 561, 444 P.2d 353].)
*180 "The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that other can be ascertained." (Prob. Code, § 106.)
(3) "It is generally recognized that a testamentary instrument is to be examined with a view to discovering the decedent's testamentary scheme or general intention, and that the apparent meaning of particular words, phrases and provisions is to be subordinated to this scheme, plan or dominant purpose." (Estate of Puett (1934) 1 Cal.2d 131, 133 [33 P.2d 825].)
Since the decision of the Supreme Court in Parsons v. Bristol Dev. Co. (1965) 62 Cal.2d 861 [44 Cal. Rptr. 767, 402 P.2d 839], it has been settled that it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (4) Therefore, except where credibility is involved, an appellate court is not bound by the interpretation of the trial court. Rather the appellate court must draw its own inferences from the evidence and interpret the instrument "according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (62 Cal.2d at p. 865.)
This standard of review applies to wills as well as to contracts. (Estate of Russell, supra, 69 Cal.2d at p. 213. Accord: Estate of Fries (1965) 238 Cal. App.2d 558, 561 [47 Cal. Rptr. 888].)
The attorney who drew the will testified that the testatrix came to his office with some notes and dictated to his secretary the text of her bequest to petitioners. He used her language verbatim as article Fourth of the will. No other explanation for the choice of language appears in the record.
Article Fourth of the will, read literally, bequeaths "all of my personal belongings and effects." (5) The words "personal effects," by themselves, ordinarily designate only "such personal property as is worn or is carried about or attends the person." (Estate of Douglass (1945) 70 Cal. App.2d 279, 282, 289 [161 P.2d 66].) (6) But "effects" is used here in conjunction with "belongings," a word which ordinarily has a broader meaning. (Estate of Kuttler (1960) 185 Cal. App.2d 189, 202 [8 Cal. Rptr. 160].)
(7) The entire phrase is followed by the words "including all personal property items intended for personal use or adornment." The word "including" ordinarily is a word of enlargement, indicating something beyond the narrowest meaning of the language which precedes it (Estate of Douglass, supra, 70 Cal. App.2d at p. 284); but items intended for personal adornment *181 are generally included within "personal effects" in the narrowest sense of that term. Items "intended for personal use" could mean a larger class.
Attempting to apply the "ordinary" meaning of the words in article Fourth presents some difficulties. We therefore follow the example of other cases which have looked to the testamentary plan as a whole to discover what the testatrix meant by "personal effects" or "personal belongings." In Estate of Olson (1956) 144 Cal. App.2d 694 [301 P.2d 501], the will as a whole showed that the words "I want Inez my Daughter to have all My Personal belongings" was a bequest of the entire estate. In Estate of Doolittle (1963) 218 Cal. App.2d 691, 694-695 [32 Cal. Rptr. 649], construing an elaborate will and codicil, the court gave the words "personal belongings and household effects" a very limited meaning. In Estate of Smith (1967) 256 Cal. App.2d 496 [64 Cal. Rptr. 295], a testatrix, who had an attorney-drawn formal will, made a holograph codicil authorizing a friend to dispose of "personal belongings." In the light of the will as a whole, this codicil was construed as affecting only some miscellaneous articles of little value. And in Estate of Hampton (1968) 262 Cal. App.2d 532 [68 Cal. Rptr. 828, 30 A.L.R.3d 790], where a formal will created a residuary trust in favor of a university, the court rejected the contention of a niece that the bequest of "all my personal belongings" gave the residue to her. Rather the court held the niece was entitled to chattels and personal effects valued at $320.
In Estate of Randall (1966) 240 Cal. App.2d 85 [49 Cal. Rptr. 280], the will contained, among other bequests, "personal effects" to a grandniece. The testatrix had some $5,568 in the "Patient's Fund Account" at the veterans hospital where she had been a patient for a considerable time. Evidence was offered to show that the words "personal effects" as commonly used at the hospital included the money on deposit there, and that the testatrix had written letters stating her intention to leave this deposit to her grandniece. The trial court excluded the evidence and gave the $5,568 to the residuary legatee. The appellate court held it was error to exclude the evidence, and pointed out that the appellant's theory was not inconsistent with the other provisions of the will.
On the other hand, in Estate of Sorensen (1941) 46 Cal. App.2d 35, 38 [115 P.2d 241], the circumstances satisfied the court that a bequest of "personal effects" could only be given its customary narrow meaning.
(1b) Turning to the case at bench, viewing the overall testamentary plan, as applied to the kind of property the testatrix left, in the light of what the record shows about her as a person, we cannot say that the trial court erred in interpreting the will.
The testatrix, aged 78 at the time of her decease, had accumulated an *182 unusual quantity of household goods and other things in the family home which she had occupied since 1928. The monetary value of most of the things in the house was slight in relation to her total wealth, which was mostly in savings accounts and securities. Her will discloses no purpose of enriching any relatives or other individuals. The eight bequests of $3,000 each were more in the nature of remembrances. Her testamentary objective was to convey the bulk of her wealth to the four charities. Such beneficiaries, however, would have no use for any of her property except for its economic value. It is understandable that the items that filled her house, valued more in sentiment than in money, would be left to her close friends, the petitioners.
There is nothing in the record to suggest that petitioners were in need of anything, or that the testatrix was motivated by any desire to confer an economic benefit beyond the $3,000 bequests. The furniture in the house, along with the more personal items, together with the 10-year-old automobile, were appropriately left to the friends.
The coin collection had belonged to Mr. Johnson, and there is no reason to think it represented anything to the testatrix or to petitioners except an asset of some undetermined value. It is therefore an item to go to the residuary beneficiaries, who may sell it and devote the proceeds to their charitable purposes. The trial court treated the stamp collection differently, allowing it to pass to petitioners as a part of the "personal belongings." The testatrix had sold a part of that collection, and it is a reasonable inference that she sold what she regarded as the more valuable and salable portion. The evidence shows and the trial court found that at the time the testatrix executed her will she was not aware of the value of the coin collection and the stamp collection. Nevertheless the coin collection was a recognizable economic asset even to the testatrix' untrained eye, and she was seeking a buyer before she died. The plan of her will, read as a whole, indicated that an asset so readily convertible into substantial cash should go to the residuary beneficiaries. But, she had made a sale of stamps, and it is a reasonable inference that she regarded the remainder as a part of the miscellany to go in bulk to petitioners.
(8) Petitioners object to the language in the order of the probate court which distributes to them "All items of personal property of value located in the residence...." They argue that the phrase "of value" deprives them of all personal effects which lack monetary value. We do not so construe the order. The phrase "of value" might well have been omitted, but we think it was used only in the sense of distinguishing between items which petitioners would want and the junk which had been or would be thrown away. Items of value, in this context, include things which petitioners would *183 want to keep for personal reasons. The distribution to petitioners is not limited to items having a market value.
Petitioners criticize the trial court's order for failing to make clear which of the coins in the house go to them. The order gives to the residuary beneficiaries "cash; ... and (e) all coins located in decedent's said residence at the time of her death in coin albums, collectors' coin envelopes, safes, locked closets, locked metal cabinets, and under conditions clearly reflecting that they were acquired as part of a coin collector's coin collection; ..."
The trial court's findings state that the executors found in the decedent's house "a disorganized coin collection ... and $499.12 in cash scattered about said residence."
Petitioners point out that the evidence showed there were some loose coins in the house which were identifiable as collectors' items (as distinguished from "cash") which were not in albums, envelopes or locked places. Such loose coins would belong to petitioners under the court's order. The trial court appeared to recognize this, for, in announcing from the bench its intended ruling, it drew a distinction between the "formal coin collection" and "any loose coins that were in jars or something of that nature."
Understandably neither the findings nor the order attempted to catalog the loose coins. Nor did the evidence describe them any more specifically. We think the order was definite enough to enable the executors to make the division which the court intended. If there is a dispute about the classification of particular coins or jars of coins the probate court will be able to interpret its own order and direct the executors appropriately.
Petitioners urge that they are entitled to the furniture in the testatrix' apartment as well as the furniture in the home. The record fails to show whether the testatrix had the apartment at the time she made her will. We do not know what was in the apartment. Nor is there any other evidence which would illuminate her intentions with respect to the apartment furnishings.
(9) The bequest to petitioners is stated in article Fourth as "all of my personal belongings and effects, including all personal property items intended for personal use or adornment and which are present in my residence at 1609 North Alexandria Avenue, ..." We have noted above some of the difficulties in attempting to find a literal meaning for that language. Nevertheless, absent some better guide to the testatrix' intention, it is reasonable to give to the "and which" clause a literal reading as a limitation upon the bequest, that is, to exclude items found elsewhere.
(10) Petitioners offered evidence showing that the testatrix had been born in England and had come to California in 1915. Although her husband *184 became a naturalized citizen, the testatrix never gave up her British nationality, and she retained her interest in things British, served tea regularly, and used British idioms in her speech. Upon that foundation petitioners argue that under British law the expression "personal belongings and effects" has a broader meaning than in California law, and that testatrix must have used that expression for its British meaning.
We do not find that approach to be decisive in the interpretation of this will. The trial court concluded, and we do also, that petitioners are entitled to more than what is conveyed by the literal meaning of "personal effects." The interpretation given to article Fourth, based upon an analysis of the testamentary plan as a whole, is not overturned by the circumstance of the testatrix' British background.
Petitioners contend the trial court erred in allowing the testatrix' attorney to testify over objection "she [testatrix] said, `My personal things in the house I want in this clause [referring to article Fourth]'" and "She said that I and Mr. Price would have the job of cleaning up the Estate, as she put it." Error is also claimed in the ruling of the trial court which excluded the testimony of the petitioner Lockhart that the testatrix had told her "that she was going to `leave all this mess to you and Mrs. Tucker and you two can fight over it.'" Petitioners' brief fails to show how any of those indefinite statements could have clarified what is meant by the language of article Fourth of the will. Since none of them aids us in the interpretation, there can be no prejudice (see Kusmark v. Montgomery Ward & Co. (1967) 249 Cal. App.2d 585, 592 [57 Cal. Rptr. 678]) and we need not pass upon the question of admissibility.
The appeal of the residuary legatees is grounded on their contention that the "personal belongings and effects" should be limited to the narrow meaning of "personal effects," so that the household goods, the stamp collection, and the 1955 automobile would fall into the residue. For the reasons set forth above, their contentions are rejected.

The November 2, 1967, Order
(11) The order entered November 2, 1967, approved the executors' first account current, decreed preliminary distribution, authorized partial payment of statutory fees and commissions, and awarded extraordinary fees and commissions. Petitioners are appealing from that order insofar as it (a) ordered distributed to the residuary beneficiaries the coin collection, and (in paragraph 7 q)) "the household goods, paintings, antiques, fine arts, collections other than coins and stamps, and miscellaneous items"; (b) approved the executors' account current; and (c) allowed extraordinary compensation to the executors.
*185 This order was made after the hearing on the petition to determine interests, but prior to the entry of the order determining interests. The order of November 2 states that the petition to determine interests will be the subject of a separate order. It was evidently an oversight that the November 2 order contains language distributing some of the articles which pass to petitioners under article Fourth, as construed by the court in its December 27 order. It will be necessary therefore to modify the November 2 order to make the two consistent.
(12) Petitioners' objection to the account current is that after the hearing, but before the filing of the order, the appraisal of certain items had been revised, but the order is based upon the former appraisal. The change in valuation will of course be reflected in the next account, so there is no problem.
(13) Petitioners' attack upon the allowance for extraordinary services of the executor is unnecessary. Payment of these fees will come entirely from the cash (over $200,000) which will go to the residuary beneficiaries, who are not appealing from that order. Petitioners do not claim they are prejudiced. Rather their counsel baldly assert that, since they are interested in the estate, they "having standing to question any matter relating to its administration." It appears that counsel have confused "interest in the estate" with interest in the subject which is at issue. More than a century ago our Supreme Court, speaking of an attempted attack upon an administrator's account, said this: "The rule is universal in all legal proceedings that parties not interested have no concern in them and cannot be allowed to intermeddle. If, then, a party seeks to interpose and participate in or originate a judicial controversy, and his right to interfere is denied, the first duty cast upon the Court is to determine whether such person has any interest whatever in the subject matter pending before it, and if it turns out he has none, he must be declared an intruder and excluded from any further participation." (Garwood v. Garwood (1866) 29 Cal. 514, 519.)
This principle was applied in Estate of Casner (1905) 1 Cal. App. 145, 147 [81 P. 991], where the court disposed of one of the points raised by the appellants with the statement that "the decree of the court below [settling the executor's account and decreeing distribution] will not be disturbed unless the appellants show that their interests in the estate have suffered in some way by reason of the findings or decree of the court." (Italics in the original.)
See also Estate of Land (1913) 166 Cal. 538, 539, 542 [137 P. 246], holding the appellant was not "interested" for the purpose of maintaining a will contest.
*186 We need not review the allowance of extraordinary fees and commissions on this appeal.
The order entered December 27, 1967, is affirmed. The superior court is directed to modify paragraph 7 q) of its order of November 2, 1967, to remove any conflict with the provisions of the December 27 order. In other respects the November 2, 1967, order is affirmed. No party shall recover costs on appeal.
Kingsley, J., and Dunn, J., concurred.
A petition for a rehearing was denied April 6, 1970, and the application of the petitioners and appellants for a hearing by the Supreme Court was denied May 6, 1970.